# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 11 2019, 10:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT S.D.

Roberta Renbarger
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent–Child Relationship of F.N. (Minor Child)

and

S.D. (Mother) and A.L. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

January 11, 2019

Court of Appeals Case No. 18A-JT-1880

Appeal from the Allen Superior Court

The Honorable James R. Heuer, Senior Judge

Trial Court Cause No. 02D08-1712-JT-214

**Bradford, Judge.**

# Case Summary

[1] S.D. ("Mother") and A.L. ("Father")[1] are the biological parents of F.N. In 2014, at five months old, F.N. was placed in foster care and adjudicated to be a child in need of services ("CHINS") due to Mother's and Father's inability to address her special medical needs and domestic violence concerns. In December of 2017, the Department of Child Services ("DCS") petitioned for the termination of Mother's parental rights, after she failed, for nearly an entire year, to participate in home-based and domestic-violence services, attend visitation and F.N.'s medical appointments, and maintain contact with DCS. On July 10, 2018, the juvenile court ordered that Mother's parental rights in F.N. be terminated. Mother contends that the juvenile court's termination of her parental rights was clearly erroneous. Because we disagree, we affirm.

# Facts and Procedural History

[2] Mother and Father are the biological parents of F.N. (born March 21, 2014). F.N. was born prematurely and continues to suffer significant medical issues. Due to Mother's and Father's inability to provide the necessary care for F.N. and the occurrence of domestic violence between the parents, F.N. was placed

---

[1] Father has not appealed the termination of his parental rights. Therefore, we will only address the termination of Mother's parental rights.

in foster care upon her release from the hospital at five months old and has remained there since. Currently, F.N. has monthly medical appointments with a pediatrician, lung specialist, and gastroenterologist and attends speech therapy weekly to learn how to swallow food. F.N. also has a feeding tube which is used to provide her with PediaSure three times daily and must be changed every six months.

[3] In 2014, F.N. was adjudicated to be a CHINS, and Mother was ordered into reunification services. In 2015, the juvenile court changed the permanency plan from reunification to adoption after Mother failed to satisfactorily participate in ordered services. In August of 2016, the juvenile court entered an order denying termination and changing the permanency plan back to reunification, after finding that Mother had begun complying with services.

[4] After a February 2017 review hearing, the juvenile court found that Mother had "recently been battered by a boyfriend and appeared in court with a black eye that was healing [and noted that it had] concerns about whether she has benefited from services provided." State's Ex. 12. In March of 2017, DCS held a Child and Family Team Meeting with Mother and her family to discuss the possibility of a change of custody of F.N. to Mother's sister and brother-in-law. After a background check revealed the brother-in-law's previous conviction for domestic battery in the presence of a child, that plan was disqualified. Around that time, Mother moved out of her house, where she lived with her mother, sister, and brother-in-law, and moved in with Father. Mother completely stopped participating in services, including visitation and attendance at F.N.'s

medical appointments. Mother failed to appear for hearings in August of 2017, November of 2017, and January of 2018, and at the November hearing the juvenile court changed the permanency plan to adoption. The juvenile court found that Mother had failed to visit F.N., participate in home-based and domestic-violence services, and maintain contact with DCS. On December 12, 2017, DCS petitioned for the termination of Mother's and Father's parental rights. In February of 2018, Mother and Father came to the DCS office and requested that services resume. In March of 2018, supervised visitation resumed, and in April of 2018, Mother resumed participating in services. On May 30, 2018, and June 7, 2018, the juvenile court held an evidentiary hearing on the termination petition.

Virervia Rodriguez, a caseworker for Amani Family Services, supervised Mother's visits with F.N. and provided her with parenting and domestic violence education until March of 2017 and again starting in March of 2018 when Mother resumed services. Rodriguez testified that in February of 2017, after observing bruising around Mother's eyes and forehead, Mother told her that "she hit herself with something but at the end she confirmed that [Father] hit her." Tr. Vol. II p. 30. Rodriguez, however, recommended to the juvenile court that Mother be granted unsupervised visitation, noting that she was participating in the resumed services, employed, and not a safety concern and had moved back in with her mother, sister, and brother-in-law.

DCS family case manager Amanda Ray ("FCM Ray") was assigned to the case in August of 2014 and testified that in March of 2017, Mother "fell off the

map." Tr. Vol. II p. 117. FCM Ray explained that from March of 2017 to March of 2018, Mother was completely absent and the only contact FCM Ray had with Mother was during an unannounced visit at Father's residence in November of 2017, while serving them notice of the termination proceedings. During that visit, FCM Ray noticed that Mother's lips were cut and swollen. When FCM Ray asked Mother about her lips, she replied that they were "chapped." Tr. Vol. II p. 98. FCM Ray noted that Mother still had not obtained a driver's license or her own residence and that there were still concerns related to domestic violence.

[7] Guardian *ad Litem* Konrad Urberg ("GAL Urberg") testified that it was in the best interests of F.N. if parental rights were terminated. GAL Urberg expressed his concern with Mother's one-year absence, stating "It appears that once— shortly thereafter the termination petition was again filed she resurfaces and begins to say—tries to get services again." Tr. Vol. II p. 134. He also expressed concern over the domestic violence between Mother and Father.

[8] On July 10, 2018, the juvenile court ordered that Mother's parental rights be terminated. The juvenile court concluded, *inter alia*, that the conditions that resulted in F.N.'s removal would not be remedied, continuation of the parent– child relationship posed a threat to F.N.'s well-being, and termination of Mother's parental rights was in F.N.'s best interests.

# Discussion and Decision

[9]     The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). The parent–child relationship is "one of the most valued relationships in our culture." *Neal v. DeKalb Cty. Div. of Family & Children*, 796 N.E.2d 280, 286 (Ind. 2003) (internal citations omitted). Parental rights, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate the parent–child relationship. *Bester*, 839 N.E.2d at 147. Therefore, when parents are unwilling or unable to fulfill their parental responsibilities their rights may be terminated. *Id.*

[10]    In reviewing the termination of parental rights on appeal, we neither reweigh the evidence nor judge the credibility of witnesses. *Doe v. Daviess Cty. Div. of Children & Family Servs.*, 669 N.E.2d 192, 194 (Ind. Ct. App. 1996), *trans. denied*. We consider only the evidence and reasonable inferences therefrom which are most favorable to the juvenile court's judgment. *Id.* Where, as here, a juvenile court has entered findings of facts and conclusions of law, our standard of review is two-tiered. *Id.* First, we determine whether the evidence supports the factual findings, second, whether the factual findings support the judgment. *Id.* The juvenile court's findings and judgment will only be set aside if found to be clearly erroneous. *Id.* A finding is clearly erroneous if no facts or inferences drawn therefrom support it. *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005). "A judgment is clearly erroneous if the findings do not support the

juvenile court's conclusions or the conclusions do not support the judgment." *Id.*

[11] Indiana Code section 31-35-2-4(b) dictates what DCS is required to establish to support a termination of parental rights. Of relevance to this case, DCS was required to establish by clear and convincing evidence

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> [and]
>
> (C) that termination is in the best interests of the child[.]

Ind. Code § 31-35-2-4(b)(2).

[12] It is not disputed that F.N. had been removed from Mother for at least six months under a dispositional decree and that there was a satisfactory plan for the care and treatment of F.N., and that both required findings pursuant to Indiana Code section 31-35-2-4(b)(2). However, Mother contends that the trial court erred by concluding that (1) the conditions that resulted in the removal of F.N. from Mother's care would not be remedied, (2) the continuation of the parent–child relationship between F.N. and Mother posed a threat to F.N.'s

well-being, or (3) termination of Mother's parental rights was in F.N.'s best interests.

# I. Indiana Code Section 31-35-2-4(b)(2)(B)

Mother argues that there is insufficient evidence to establish a reasonable probability that the conditions that resulted in F.N.'s removal would not be remedied or that the continued parent–child relationship posed a threat to F.N. Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS was only required to establish one of the circumstances.[2] We choose to first address Mother's argument that the trial court erred by concluding that the conditions which resulted in F.N.'s removal would not be remedied.

> In determining whether the conditions that resulted in the child[ren]'s removal…will not be remedied, we engage in a two-step analysis[.] First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation. We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. Requiring trial courts to give due regard to changed conditions

---

[2] A third circumstance for satisfying the provisions of Indiana Code section 31-35-2-4(b)(2)(B) is to establish that the child has been adjudicated to be a CHINS on two separate occasions; however, that circumstance is not applicable in this matter.

> does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*In re E.M.*, 4 N.E.3d 636, 642–43 (Ind. 2014) (internal citations, quotations, and footnote omitted, first and third set of brackets in original, second set added).

[14] The conditions that led to F.N.'s removal were Mother's and Father's inability to address F.N.'s special medical needs and domestic violence concerns between the parents. DCS produced ample evidence to establish a reasonable probability that these conditions would not be remedied. F.N. requires monthly visits to a pediatrician, lung specialist, and gastroenterologist, with the latter being located at Riley Children's Hospital in Indianapolis. In addition, F.N. must attend weekly speech therapy to learn how to swallow and requires a feeding tube. After four years, Mother still has not acquired a valid driver's license or learned how to use the public transportation system. Most troubling, Mother was utterly absent and unaccountable for nearly a year. F.N.'s medical needs require someone who can provide consistent care and transportation, and Mother has demonstrated that she cannot do so. Moreover, concerns regarding domestic violence remain. In February of 2017, the juvenile court noted that Mother appeared in court with a black eye having been battered by her boyfriend. In November of 2017, FCM Ray observed Mother's cut and swollen lips during an unannounced visit at Father's residence. Mother has also failed to secure independent housing and remains in a home with her brother-in-law, who has a domestic violence conviction himself.

In sum, we agree with the observations of GAL Urberg that Mother appears only to request and participate in services once termination proceedings have started. Mother points to her testimony that she is employed, will soon obtain a driver's license and independent housing, and does not plan to resume a relationship with Father. The juvenile court, however, was under no obligation to credit Mother's testimony and apparently did not. The juvenile court did not abuse its discretion by concluding that the conditions which led to F.N.'s removal would not be remedied. Therefore, it is unnecessary for us to address Mother's argument that there was insufficient evidence to conclude that the continued parent–child relationship posed a threat to F.N.

## II. Indiana Code Section 31-35-2-4(b)(2)(C)

Mother argues that there is insufficient evidence to support the juvenile court's conclusion that termination of Mother's parental rights was in F.N.'s best interests. We are mindful that, in determining what is in the best interests of the child, the juvenile court must look beyond factors identified by DCS and consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). The juvenile court need not wait until a child is irreversibly harmed before terminating the parent–child relationship because it must subordinate the interests of the parents to those of the children. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). We have previously held that recommendations from the FCM and court-appointed special advocate to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, is sufficient evidence to

show that termination is in the child's best interests. *In re J.S.*, 906 N.E.2d at 236.

[17] FCM Ray testified that it was the recommendation of DCS that Mother's rights be terminated and an adoption plan for F.N. proceed. GAL Urberg testified that it would be in F.N.'s best interests if Mother's parental rights were terminated. Coupling our previous conclusion that there was sufficient evidence to show the conditions of removal would not be remedied with the recommendations of FCM Ray and GAL Urberg, we further conclude that there is sufficient evidence to show that termination of Mother's parental rights was in F.N.'s best interests. Mother has failed to establish that the juvenile court's judgment was clearly erroneous in any respect.

[18] The judgment of the juvenile court is affirmed.

Bailey, J., and Brown, J., concur.